And your honor, we're going to be combining our time. Um, good morning and may it please the court. Ryan Wong of the UC Irvine Appellate Clinic for Petitioner appearing under the supervision of Peter Afrasiabi. I will be addressing the past and future persecution issues, as well as the withholding of removal claim. And my co-counsel will be addressing all issues related to relocation, as well as the convention against torture claim. We'd like to reserve a total of three minutes for rebuttal. This court should reverse because the agency below erred as a matter of law in concluding that petitioner's mistreatment was harassment, but did not rise to the level of persecution. First, the IJ found petitioner's testimony to be credible. And that credible testimony shows that when viewed in the aggregate, petitioner's mistreatment constituted past persecution. Petitioner was subjected to death threats almost immediately after his participation in an anti-government protest. He was subsequently attacked with smoke bombs at his family home. Armed men on motorcycles tried to force him off the road on several occasions. He was surveilled by armed and masked men and received subsequent death threats. And his close relatives, his father and his aunt, were confronted about his whereabouts. And in the case of his aunt, she was confronted by masked and armed men. This mistreatment rises to the level of persecution and is very similar to the type of mistreatment this court in Ruano held constituted past persecution. The government also argues that petitioner's mistreatment was merely the results of a personal vendetta. And this just is not supported by the record. The government seems to base this personal vendetta theory on the fact that petitioner has known Mr. Blandon, the individual persecuting him for a long time. But the fact that petitioner knew his persecutor does not make this per se a personal vendetta. And in addition, there is no evidence that Mr. Blandon was subjecting petitioner to mistreatment before his participation in the anti-government protest. And furthermore, Blandon, the individual who was persecuting him, did not act alone. He was accompanied by members of a paramilitary organization on nearly every other occasion when petitioner was attacked with smoke bombs, when petitioner was surveilled, and given subsequent death threats. As for future persecution, petitioner has demonstrated an objective fear of future persecution. As an initial matter, the IJ ignored evidence in petitioner's father's and aunt's declarations stating that they feared for his physical safety if he were to return to Nicaragua. And in addition, the country conditions reports show that the Nicaraguan government and pro-government armed elements were attacking people who had participated in the protest. They were conducting illegal arrests. In some cases, those individuals were tortured or violently killed. And young, educated men were particularly being targeted and were most at risk of persecution. Petitioner falls into this group and is thus similarly at risk. And petitioner's father also testified that even after petitioner had left Nicaragua, a member of the paramilitary group was looking for him and the Petitioner's age, education, and gender fall closely within the criteria of individuals that were most seriously and violently targeted by the government and these pro-government armed elements. And so the IJ's determination that there's no particular risk to petitioner isn't supported by substantial evidence. And finally, with respect to withholding of removal, petitioner was subjected to past persecution, entitling him to a presumption of eligibility for withholding of removal. But even in the absence of finding past persecution, he would still qualify because the record demonstrates that his persecutors had both an individualized interest in him and had a pattern or practice of targeting similarly situated individuals. As I mentioned before, petitioner was targeted specifically by Blandon almost immediately after his participation in an anti-government protest. He was targeted by men on motorcycles on multiple occasions, and he was surveilled by armed and masked men. And country conditions reports show that the Nicaraguan government and pro-government armed elements were attacking people who had participated in the process, were attacking people who were alleged or believed to participate in the protest. They were conducting illegal arrests and worse. Young educated men were in particular being targeted and thus were most at risk. And so the IJ's conclusion that petitioner was not eligible for the credible evidence in the record. So let me just ask you one question, maybe two. So just to zero in on a moment on the events that lead you to argue that there was past persecution here. So when I looked at the record, we looked at the briefs and whatnot. So there's a smoke bomb outside his family's home, correct? Correct. There's the, the paramilitary member, four individuals who were looking for him? Yes, that's correct. Okay. And he was apparently, so they tried to, he was, while he was driving his car, he was pushed off the road or attempted to be pushed off the road by a motorcyclist, is that correct? That's correct. In that case, there were multiple motorcyclists. They were armed and masked. And he believes at least two of them were members of the police based on their uniforms. Yeah. Now, is there anything else? He was surveilled outside of his home such that he felt that he couldn't leave freely. As you mentioned, his, his relatives were closely confronted and then he received subsequent death threats by, not just the initial death threat, but subsequent to that by members of the paramilitary organization. When was the first death threat? The first death threat was almost immediately after his participation in the anti-government protest. So that was in, in February. So he participated in a protest on Tuesday. That Saturday, he returned home. And he was confronted by Blandon, the member of the paramilitary group, who called him an overthrower, said death to overthrowers and made throat slicing gestures. And the other death threats? Those occurred after he was, the record is not entirely clear, but at some point after the smoke bombing and perhaps sort of intermittently between the multiple instances in which he was attempted to be forced off the road, paramilitary members surveilled him and he received additional death threats from Blandon and another individual, Mr. Romero, and this is at page 269, 269 in the record and 205 in his direct testimony. Okay. Thank you. And if there are no further questions, I'll turn it over to my co-counselor. Hey, please. The court, Jonas Treveden for petitioner. And I'll first be addressing the issue of relocation and then follow it up with a cat claim. Beginning with relocation, the IJ's finding that relocation was possible contains two material errors here that warrant reversal. And the first error was legal. Because petitioner suffered past persecution, he was entitled to a rebuttable presumption that relocation would not be possible. That presumption would have put the burden on the government to do two things. To either one, identify a specific city where petitioner could safely relocate to, and then conduct a relocation analysis with respect to that city. Or two, submit additional evidence showing a change in circumstances such that it makes a relocation possible. But at trial, the government did neither of those two things. And in failing to do so, it simply didn't meet its own legal burden. But even if that assumption wasn't applied to petitioner, the IJ's finding that relocation was possible is still not supported by substantial evidence. The country conditions report made clear that in Nicaragua, there was a nationwide crackdown on political dissenters. And the record further compels the conclusion that pro-Sandinista armed elements operated throughout the entire countries, in urban areas, in rural areas, and in cities large and small. And moreover, at trial, your honors, the government had both the opportunity and the resources to provide additional evidence showing that one city was safe to relocate to, but they never did so. And nor did the government identify any aspect of the country conditions evidence documenting a city where it was safe to relocate. And the reason they were unable to, they did not do so is because no such place exists, your honor. Because the pro-Sandinista armed groups operate throughout the entire country, relocation is not possible. And this court should reverse because it's not supported by substantial evidence. And if there are no questions on relocation, I'll address the cat claim. This court should also reverse the IJ's denial of cat relief because the likelihood of torture here is akin to the level and likelihood of torture in Nuru, Viganzales. Now in Nuru, the Ninth Circuit reversed and found that the cat relief was, that petitioner established entitlement to cat relief on two primary grounds. And the first was that the country conditions report showed that in Eritrea, the country where the petitioner filed for, the, there were major human rights abuses committed by members of the military and police. And the second piece of evidence focused on by the, by the court there was that the, at least some political deserters who fled the country were subject to torture. And here, both of those conditions are met. Now, first, with regard to the major human rights abuses, the record is clear and the government doesn't contend that there were no such violations. Rather, the record is clear that there were major human rights violations across the entire country, specifically arising out of the context of the protests that began in 2018. But with the second point, the country conditions evidence actually goes one step further because it not only shows that protesters were tortured, it goes one step further and shows that young, well-educated men who were protesting were the most likely group to be tortured amongst any other group. And here, petitioner fits all of those characteristics. He's two years out of college, he's young and he protested. And as a result of that, he suffered from persecution and he's likely to be tortured upon removal. And if there are no further questions, I will, I'd be happy to reserve the remaining time for rebuttal. Thank you. Okay, let's hear it from the government. Good morning, your honors. May it please the court. Rachel Berman-Voporos for the attorney general. Can I ask a question? Can I just ask a quick question? Of course, your honor. Would he actually, are we actually deporting people now like these, forgetting about, you know, what level the conduct of the government constitutes persecution or torture? Are we actually deporting people to Nicaragua? Your honor, I do not have any information specifically on that. And I'm happy to look into that and follow up with this court at a later date, when someone has been found removable and they are a petition for review and their petition review is for denied, it is lawful for the United States to then seek to remove them. But the mechanics of that rely with the Department of Homeland Security. Okay, I'm sorry. Go ahead. Not at all, your honor. The court should deny this petition for review because substantial evidence supports the agency's conclusion that the petitioner did not meet his burden of proof to show that the harassment and vandalism that he experienced rose to the level of persecution, or that he has a well-founded fear of persecution, or he can internally relocate. And there's insufficient evidence that the government or Siena Nises were targeting individuals who had previously engaged in political protests at the time of the immigration justice decision in August, 2019. For similar reasons, the petitioner did not meet his burden to show that he's eligible for protection under the convention against torture. Unless there are any initial questions, I will first address past persecution. The petitioner did not meet his burden to show that he experienced past persecution because no evidence compels the conclusion that the harm he experienced rose to the level of persecution. Here, the petitioner was never physically harmed. While in or around his hometown, he experienced harassment from a number of individuals, and there was one occasion in approximately July, 2018, when individuals came to his parents' home and lobbed smoke bombs, but none of these smoke bombs entered the home. They didn't damage any property. They didn't injure anyone. And most notably, when the petitioner and his family came outside to confront these individuals, these individuals ran away. Later, these individuals did begin observing the petitioner's parents' home for a lengthy period of time, several months. However, despite this observation, the surveillance, the petitioner was still able to come and go from his parents' home to where he was living and working elsewhere in Nicaragua during the week. And he was able to come and go freely from his parents' home up until he left Nicaragua in April, 2019. The other harms the petitioner experienced in Nicaragua includes an incident on one occasion when armed, unidentified men went to his aunt's home and they asked about him. Now, these individuals didn't threaten anyone. They didn't harm anyone. And after waiting for a while outside the aunt's home, they left. The only other harm the petitioner experienced in Nicaragua was on approximately four occasions, he encountered individuals on motorcycles near his hometown. And these individuals on motorcycles behaved in ways that made the petitioner believe they were trying to run him off the road or block him. However, the petitioner was not physically harmed in any of these incidents. No one on motorcycles verbally threatened him. The petitioner was always able to end up at his parents' home. And the petitioner didn't recognize or, and was unable to identify any of these individuals other than on one occasion, he identified two individuals on motorcycles as police officers. So looking at all the harms that the petitioner experienced cumulatively, there is insufficient evidence to compel the conclusion the harm he experienced in Nicaragua rose to the extreme level required to constitute persecution. Substantial evidence also supports the agency's conclusion that the petitioner did not meet his burden to show a well-founded fear of persecution for several reasons. The first reason is that the petitioner did not meet his burden of proof to show that the evidence compels the conclusion that he cannot internally relocate within Nicaragua. Because he did not establish that he experienced past persecution, it is his burden to show that he cannot internally relocate, and he did not meet that fear. In fact, the record shows that he can safely and reasonably internally relocate. Petitioner's counsel is incorrect when it says that the government, excuse me, the immigration judge did not point to any specific area in Nicaragua where the petitioner could live safely. The immigration judge specifically identified Murrah, forgive my pronunciation of it, where the petitioner was living and working during the week, during much of the time that he was experiencing harm in his hometown. In fact, Murrah is where the petitioner first participated in a political protest opposing the government. And the petitioner testified that he had no problems, he experienced no harm when he was living in Murrah. And he was able to live and work there during the week, and it was only when he returned to his hometown or near his hometown, he experienced any harm. So substantial evidence supports the agency's conclusion that the petitioner did not meet his burden to show that he cannot internally relocate. And it's important to note that even if this court disagrees and concludes that the petitioner did establish past persecution, the immigration judge found in the alternative that even if the petitioner benefited from a presumption that internal relocation was not reasonable, the government overcame that presumption, that mainly on the petitioner's own testimony, that he was able to live safely in Murrah where he was working. And then later, after he lost his job in Murrah at the end of November 2018, he later obtained other work throughout Nueva Segovia and was able to go to work and return to his parents' home on the weekends without any issue up until he left Nicaragua in April 2019. The other reasons why the petitioner did not establish a well-founded fear of persecution are that no evidence compels the conclusion that his fear of persecution in Nicaragua is objectively reasonable. The petitioner testified that his whole family is viewed as opponents of the government, but outside some instances of harassment, they have not been harmed. No one has come to them and tried to arrest them. This includes the petitioner's politically active aunt who, like the petitioner, engaged in political protest and arguably engaged in even more political activity than the petitioner because she is actually a member of an opposition political party and she handed out flyers. So despite his family being seen as opponents of the government, they have not been harmed. The petitioner also testified that the other individuals who participated him, participated with him, excuse me, in a political protest in Murrah, he is unaware of any of them have experienced any harm. The petitioner was able to obtain his passport and national identity card from the government after participating in both political protests and prior to leaving Nicaragua. Moreover, there is insufficient evidence that the government or Sandinistas were targeting individuals for having previously engaged in political protests at the time of the immigration judge's decision in August, 2019. The country conditions evidence that petitioner's counsel is referring to in his segment is referring to what was happening during the height of the political upheaval in the spring and the summer of 2018, but not to the decision, which is almost a year later. The last reason the petitioner did not establish a well-founded fear of persecution is because no evidence compels the conclusion that there is a pattern or practice of individuals, excuse me, a pattern or practice of persecution of individuals similarly situated to him. Again, the petitioner's family, viewed as opponents of the government, have not been harmed or arrested. The petitioner testified that individuals who participated with him in his first political protest in Mara, he is not aware of any of them have been harmed. He is able to obtain documentation from the government, and he was able to come and go from his parents' home to elsewhere in Nicaragua up until he decided to leave the country. So substantial evidence supports the agency's conclusion that the petitioner did not meet his burden to show a past persecution or well-founded fear of persecution, and therefore did not establish eligibility for asylum or holding of removal. Unless there are any questions, I will now address the Convention Against Torture. The petitioner did not meet his burden to show that the evidence compels the conclusion that he established eligibility for protection under the Convention Against Torture. Substantial evidence supports the agency's finding that the harms the petitioner experienced in the past did not rise to the level of torture, and whether someone has experienced torture in the past is the first factor that this court looks to in determining eligibility for protection under the Convention Against Torture. The petitioner also did not meet his burden to show a sufficient likelihood of future torture in Nicaragua. Again, the petitioner in the past was not tortured, and there's insufficient evidence in country conditions, evidence in the record, that would indicate that the government or anyone else would harm him upon his return to Nicaragua, a harm that rises to the level of torture. There is no threat of arrest here. The country conditions evidence in the record shows that during the political upheaval in the spring and summer of 2018, the government was targeting individuals who were human rights defenders, leaders of protests, student activists, leaders of rural movements. The petitioner is none of these. He engaged in two political protests, but he did not testify to leading or organizing anything. And so there's insufficient evidence in country condition evidence to show that the evidence compels the conclusion that the petitioner will be tortured with the consent or acquiescence of the government in the future. And moreover, the petitioner can also internally relocate to be safe from the fear that he has of the individuals in his hometown. The immigration judge found that the petitioner experienced harm only in or around his hometown, that his fear of future persecution is very localized to his hometown and that he can live safely elsewhere in Nicaragua, which is shown by the petitioner's own testimony that he's able to live and work safely in Murrah and was also able to obtain work in other smaller coffee plantations later, where he worked up until he left Nicaragua in April, 2019. Unless there are any questions, I will close. So in conclusion, the court should deny this petition for review because the petitioner has the burden here and the petitioner has not met his burden to show that the evidence compels the conclusion that he established eligibility for asylum, withholding of removal, or protection under the Convention Against Torture. Thank you all for the opportunity to speak today. Okay. We've got a little time for one more question. Rebuttal. Thank you, your honors. I'll be quickly addressing the persecution issues. The government argues that petitioner never suffered from violence, but violence isn't required to find passive persecution. In fact, in Navas, this court held that death threats alone can constitute past persecution. In this case, we have more than just mere death threats. In addition, the government says that petitioner could come and go freely from his home. This is simply not true. On page 237, he discusses the fact that he had to hide. On page 250, he notes that he left his motorcycle at a friend's house and had to sneak in and out of his parents' house. And finally, the argument that his family wasn't persecuted is not relevant. We're not arguing that he is similarly situated to his family. And in addition, he was found credible as to what happened. He was issued death threats in addition to mistreatment that was sufficiently specific menacing in nature combined with confrontations and vandalism. This amounts to past persecution. And in addition, the government characterizes the individuals that were persecuting petitioner as just a bunch of individuals. Well, that's simply not true. These were armed and masked men who were on multiple occasions surveilling him, or trying to force him off the road, or going to his relative's house to ask about his whereabouts. That characterization of his persecutors isn't an accurate reflection of the record. If the court has no further questions, I'll turn it over to co-counsel to briefly address a couple of issues. Thank you, your honors. I'll briefly address the issue of relocation and go over an argument raised by the government. And the government argues that petitioner was able to safely work and live in Murrah for several months. And so this shows that he would be able to safely relocate there. But there's three primary issues with this contention. And the first is that, first, there's no evidence in the record that the pro-Sindonesia armed elements actually seized people while they're at work. And so from this, what we can see is that, yes, although he did live in Murrah, most of the days were spent at work, but we wouldn't expect him to be seized in public at work. But what we do know is that the primary time and location when people were seized were at their home. And whenever petitioner went home for the weekends or went somewhere else on the weekends, he was constantly surveilled, monitored, or stopped by pro-Sindonesia forces. And moreover, even assuming that's not the case, petitioner on his way home from Murrah back to his hometown, he was stopped on at least three occasions by armed men, masked and armed men on motorcycles. And so again, the contention that Murrah was some safe place for a petitioner to stay simply isn't supported because harassment still arguably occurred right around Murrah when he was going to and from work. But finally, your honors, again, the government is misconstruing its burden here because the government never actually identified in the record, using the country conditions report, evidence stating that Murrah is a safe place to stay. To the contrary, the record is abundantly clear that there are cities, both large and small, that are not safe for anyone to stay when it comes to political protestors. And because the entire country as a whole, in rural and urban areas and in large and small cities, because all of those dissenters living in those places can be attacked at any moment by these pro-Santa Mista armed elements, relocation simply isn't possible. And for this reason, this court should reverse and remand. Now, if there are no further questions, we'd like to submit, your honors. Thank you. Thank you. Before we close, we just said the court would again would like to thank the clinical program at the UCI School of Law for their participation in the court's pro bono program. It's very helpful and we do appreciate it very much. So thank you. And we also appreciate the argument by the Governance Council this morning and all the arguments for that matter. So at this time, the matter is submitted for decision. Thank you. Thank you.
judges: Paez, Korman, Vandyke